**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

NCO ACQUISITION, LLC, et al.,

      Plaintiffs,

v.                                                                 Case No. 12-10122

ROY ROBERTS, JR.,

      Defendant.

_____/

**OPINION AND ORDER
DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiffs filed suit against Roy Roberts, Jr., the previous emergency manager for

the Detroit Public School District, claiming that his decision to terminate six lease

agreements entered into between Plaintiffs and the School District violated the

Contracts Clause and the Takings Clause.  Plaintiffs move for summary judgment on

the Contracts Clause claim, while Roberts cross-moves for summary judgment on both

counts.  The motions have been fully briefed, and a hearing is unnecessary.  *See* E.D.

Mich. LR 7.1(f)(2).

For the reasons given below, the court will deny Plaintiffs and Roberts summary

judgment on the Contracts Clause claim and grant Roberts summary judgment on the

Takings Clause claim.

## I. BACKGROUND

The material facts in this case are largely undisputed, although there remains a few unresolved fact-dependent issues, discussed below, that require the court to deny both parties summary judgment on the Contracts Clause claim.

The Michigan Legislature enacted the Local Government and School District Fiscal Accountability Act, 2011 Public Act 4 ("P.A. 4"), effective immediately on March 16, 2011.  Mich. Comp. Laws § 141.1501 *et seq.*  P.A. 4 allows for an emergency manager to be appointed to assist local governments that are suffering a financial emergency.  Mich. Comp. Laws  § 141.1503.  Under § 141.1519(1), "[a]n emergency manager may take 1 or more of the following additional actions with respect to a local government which is in receivership, notwithstanding any charter provision to the contrary: . . . (j) Reject, modify, or terminate 1 or more terms and conditions of an existing contract."  ("Section 19(1)(j)").  Michigan Governor Rick Snyder appointed Roy Roberts, Jr., as the emergency manager for the Detroit Public School District (the "District") in May 2011.  The District had a deficit of approximately $327 million when Roberts was appointed.  Roberts began taking various measures to reduce the deficit such as laying off employees, cutting wages and benefits, and closing schools and other buildings.

Plaintiffs NCO Acquisition, LLC; FK North, LLC; FK South, LLC; and Lothrop Associates Limited Partnership entered into six ten-year leases of office space with the District (the "Leases").  On September 16, 2011, Roberts sent a letter to each Plaintiff informing them that their Lease with the District had been modified pursuant to P.A. 4 such that it may be terminated upon sixty days prior written notice.  The letters then

2

stated that Plaintiffs' respective Leases would be terminated effective November 30, 2011, "without further obligation on the part of the District upon such termination." (*E.g.*, Dkt. # 40-4 at Pg 2-3.)  On November 30, 2011, Roberts did not terminate the Leases but instead sent a second letter to Plaintiffs that provided a new sixty-day notice of termination.  The Leases were terminated on January 31, 2012.

The following table shows the dates on which the Leases were executed and originally scheduled to expire, and the impact of the terminations:

| Lease | Date of Execution | Date of Expiration | Date Terminated | Impact of early termination |
|---|---|---|---|---|
| *Suite 136 Agreement* | March 14, 2002 | August 31, 2012 | January 31, 2012 | 7 months <6% reduction |
| *Suite 1800 Agreement* | December 19, 2002 | February 28, 2013 | January 31, 2012 | 13 months <11% reduction |
| *104 Lothrop Agreement* | January 31, 2003 | March 31, 2013 | January 31, 2012 | 14 months 11.5% reduction |
| *Suite 100 Agreement* | March 10, 2003 | March 31, 2013 | January 31, 2012 | 14 months 11.5% reduction |
| *New Center Suite 450 Agreement* | April 10, 2003 | April 30, 2013 | January 31, 2012 | 15 months 12.5% reduction |
| *Fisher Suite 450 Agreement* | June 10, 2004 | May 31, 2015 | January 31, 2012 | 40 months 33% reduction |

P.A. 4 was suspended in August 2012 and put to a popular vote through the referendum process of the Michigan Constitution, Mich. Const. art. II, § 9, and eventually failed to win approval in the November 2012 election.  Even though P.A. 4 is no more, Roberts's actions as emergency manager under the statute, including the termination of the Leases, remain in effect.

Plaintiffs filed suit against Defendants Roberts, Governor Snyder, and Andy Dillon, Treasurer of Michigan, claiming that the termination of the Leases violated the Contracts Clause and the Takings Clause.  The court granted in part a motion to dismiss Defendant Snyder.  Pursuant to a stipulated order, the court dismissed without prejudice Defendant Dillon, leaving Roberts, in his representative capacity, as the sole remaining Defendant.  In August 2012, Plaintiffs moved for judgment on the pleadings on their claim that § 19(1)(j) is facially unconstitutional under the Contracts Clause.  The court denied the motion.  Plaintiffs now move for summary judgment on their claim that terminating the Leases pursuant to § 19(1)(j) was unconstitutional under the Contracts Clause.  Roberts cross-moves for summary judgment on both the Contracts Clause and Takings Clause claims.

## II. STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party must first show the absence of a genuine issue of material fact.  *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The burden then shifts to the non-moving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The non-moving party must put forth enough evidence to show that there exists a genuine issue to be decided at trial.  *Plant*, 212 F.3d at 934 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)).  "[T]here is no issue for trial unless there is

4

sufficient evidence favoring the nonmoving party for a jury to return a verdict for that

party.  If the evidence is merely colorable, or is not significantly probative, summary

judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

Summary judgment is not appropriate when "the evidence presents a sufficient

disagreement to require submission to a jury."  *Id.* at 251-52.  When deciding summary

judgment motions, "the court must view the evidence in the light most favorable to the

non-moving party, drawing all reasonable inferences in that party's favor."  *Sagan v.

United States*, 342 F.3d 493, 497 (6th Cir. 2003) (citing *Matsushita Electric Indus. Co. v.

Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  The court does not weigh the evidence

to determine the truth of the matter, but rather to determine if the evidence creates a

genuine issue for trial.  *Sagan*, 342 F.3d at 497 (quoting *Anderson*, 477 U.S. at 249).

### III. DISCUSSION

### A. Contracts Clause

i. Standard of Analysis

The Contracts Clause provides that "[n]o State shall . . . pass any . . . Law

impairing the Obligation of Contracts."  U.S. Const. art I, § 10, cl. 1.

To succeed under the Contracts Clause, a plaintiff "must demonstrate that a

change in state law has 'operated as a substantial impairment of a contractual

relationship.'"  *Mascio v. Pub. Emps. Ret. Sys. of Ohio*, 160 F.3d 310, 313 (6th Cir.

1998) (quoting *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992)).  The plaintiff

must show: (1) a contract exists, (2) a change in law impairs that contract, and (3) the

impairment is substantial.  *Mascio*, 160 F.3d at 313.  If the plaintiff establishes that a

substantial impairment exists, the burden shifts to the state to "proffer a 'significant and

5

legitimate' public purpose for the regulation warranting the extent of the impairment caused by the measure." *Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 323 (6th Cir. 1998) (quoting *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411 (1983)).  After the state satisfies its burden, the court must determine whether the measure taken was "reasonable" and "necessary" to serve that legitimate public purpose.  *Mascio*, 160 F.3d at 313 (citing *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 242-44 (1978)).

### ii. Substantial Impairment

The parties agree that the Leases were contracts entered into between Plaintiffs and the District and that Roberts's decision to terminate the Leases pursuant to § 19(1)(j) impaired the Leases.  Plaintiffs argue that terminating the Leases constituted a "substantial" impairment, and Roberts, in essence, concedes the point.  In his motion for summary judgment, Roberts points out that "[t]he second factor [in the Contracts Clause analysis] is whether the impairment is 'substantial,'" and then continues by identifying, "[i]n this case, the third factor" as the one "at issue."  (Dkt. # 41 at Pg 15.)

Roberts defines the "third factor" as "whether the impairment is nonetheless permissible as a legitimate exercise of the State's sovereign powers"—in other words, whether the substantial impairment was reasonable and necessary.  (*Id.*)  In so arguing, Roberts accepts Plaintiffs' characterization of the Lease terminations as a form of "total repudiation" of the Lease obligations.  (*Id.* at Pg 16-17.)  As the parties do not dispute that Roberts impaired the Leases at least "substantially," the court will turn to whether Roberts has offered a legitimate public purpose for the terminations.

### iii. Legitimate Public Purpose

6

Roberts asserts that the legitimate public purposes in terminating the Leases were to reduce the District's structural fiscal deficits, thus preventing financial collapse, in part by shedding leased space made unnecessary through attrition and layoffs—and in so doing, to provide more nearly contiguous office space for remaining workers. (Dkt. # 41 at Pg 12-13; Dkt. # 40-3 at Pg 6-7; Dkt. # 40-16 at Pg 8.)  The introduction of P.A. 4 states that the purpose of the statute, among other things, was "to safeguard and assure the fiscal accountability of units of local government, including school districts." Mich. Comp. Laws § 141.1501 *et seq.*, preamble.  A legitimate public purpose is one that "remed[ies] . . . a broad and general social or economic problem" and does not "provid[e] a benefit to special interests."  *Energy Reserves Grp., Inc.*, 459 U.S. at 412. Courts have held that addressing a fiscal emergency constitutes a legitimate public purpose.  *See, e.g.*, *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 444-48 (1934); *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 369 (2d Cir. 2006).  The court agrees that the welfare of Michigan citizens "would be materially and adversely affected by the insolvency" of the District.  Mich. Comp. Laws § 141.1503.  Achieving fiscal health for the District—or, more important, avoiding utter collapse—is a legitimate public purpose.

Having found that Roberts has offered a well-founded and legitimate public purpose for terminating the Leases, the court will consider whether the terminations were both reasonable and necessary to serve the public purpose of reducing the District's deficit.  Before conducting this analysis, the court first must determine the level of deference with which it should afford Roberts's decision.

iv. Deference

7

The parties disagree as to the appropriate level of deference.  When the impaired contract is between private parties "[n]ormally, we defer to the state's judgment" as to the necessity and reasonableness of a measure.  *Linton by Arnold v. Comm'r of Health and Env't, Tenn.*, 65 F.3d 508, 519 (6th Cir.1995); *see also Toledo Area AFL-CIO Council v. Pizza,* 154 F.3d 307, 323 (6th Cir. 1998).  However, when the State is a party to the contract, "'complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake.'"  *Mascio v. Pub. Emps. Ret. Sys. of Ohio*, 160 F.3d 310, 314 (6th Cir. 1998) (quoting *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 26 (1977)).

Roberts points out that it was the District, not the State of Michigan, that entered into the Leases with Plaintiffs, and that because the District is distinct from the State of Michigan, the court should defer to the Michigan Legislature's judgment in granting an Emergency Manager the power to terminate contracts, and, in turn, Roberts's exercise of that power in the termination of the instant Leases.

The Second Circuit considered this argument in *Buffalo Teachers Federation v. Tobe*, 464 F.3d 362 (2d Cir. 2006).  In that case, the New York State Legislature passed the "Buffalo fiscal stability authority act" to remedy the City of Buffalo's financial crisis. *Id.* at 366.  The statute created the Buffalo Fiscal Stability Authority, a city financial control board (the "Board"), and granted the Board the power to impose a wage or hiring freeze if such a freeze were judged essential to a financial plan or the maintenance of a city budget.  *Id.*  A teachers union and unions representing school district employees filed suit claiming that the Board violated the Contracts Clause by freezing a wage increase that was included in labor contracts entered into between the City of Buffalo

8

and the unions.  *Id.* at 367.  The defendants argued that because the City of Buffalo,

and not New York State, was a party to the contracts, the court owed "substantial

deference" to the State's judgment in passing a statute allowing the Board to impose a

wage freeze.  *Id.* at 369-70.  The Second Circuit disagreed:

> [T]he presence or absence of a state as a party to the contract is not
> determinative of the deference issue.  Defendants ignore that a public
> contract is in fact being impaired albeit through state rather than local law.
> Were we to adopt defendants' reading, state legislatures could delegate to
> an agency the power to impair a public contract of a government subdivision
> that the subdivision itself would have more difficulty impairing.  Lawmakers
> could fashion the powers delegated to the agency in a manner to insulate the
> agency's actions from constitutional attack.  We decline to open such an end-
> run around Contracts Clause law.  The better rule therefore calls for focusing
> on whether the contract-impairing law is self-serving, where existence of a
> state contract is some indicia of self-interest, but the absence of a state
> contract does not lead to the converse conclusion.

*Id.* at 370.

Here, the State of Michigan being a stranger to the contracts at issue is a factor,

perhaps "some indicia," *id.*, of the absence of self interest, but not itself *the* factor or

otherwise determinative in deciding the appropriate level of deference.  As noted in

*Buffalo Teachers Federation*, the protections afforded by the Contracts Clause could be

undermined by a state arbitraging the difference between state and local governments

to erect a legal system in which emergency manager powers could at will mow down

local government public contracts that the local governments could not themselves

touch.  Following *Buffalo Teachers Federation*, the critical inquiry for the court's analysis

at this juncture must be whether § 19(1)(j) was at all self-serving to the State of

Michigan and, if so, to what degree.

9

The State of Michigan requires the establishment of public school districts.  Mich. Const. art. 8.  Because the State of Michigan provides the largest source of revenue for the School District, (Dkt. # 41-1 ¶ 11 at Pg 19); *see also* Detroit Public Schools, Adopted Fiscal Year 2013 Operating Budget 32, *available at* http:// detroitk12.org/ data/ finance/ docs/ FY2013_Adopted_Budget.pdf, passing a law that granted an emergency manager broad powers to reduce an existing District deficit could perhaps be viewed as self-serving.  To so conclude, however, would require the court to speculate about the manner and degree to which such a reduction in the District's deficit might modify the amount of future financial aid the State would be required to provide that District, and perhaps free up those resources for deployment elsewhere.  No evidence has been submitted in an effort to establish any such connection.  Beyond engaging in speculation, there is no indication of a connection or conduit within which the financial aspect of an allegedly self-serving relationship could exist.

And, as has been previously established, the acknowledged purpose of the application of P.A. 4 to the District in this case was not to serve merely generalized penny-pinching, nor to strike at a political target, but solely to rebuild and then maintain the financial health of a School District that was on the brink of collapse.  By granting an emergency manager the power to unilaterally modify the District's contracts, there is no showing that the Michigan Legislature was acting simply to skirt its own financial obligations as a matter of "political expediency."  *Ass'n of Surrogates and Supreme Court Reporters Within N.Y. v. State of N.Y.*, 940 F.2d 766, 773 (2d Cir. 1991).  Instead, the Michigan Legislature clearly appears to have been "genuinely acting for the public

10

good." *Buffalo Teachers Fed'n*, 464 F.3d at 370.  Accordingly, the court finds no basis

to conclude that § 19(1)(j) was self-serving to the State of Michigan.

The court also considers the severity of the impairment when determining the

appropriate level of deference.  *Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307,

323 (6th Cir. 1998).  "'[T]he severity of the impairment is said to increase the level of

scrutiny to which the legislation will be subjected.'"  *Id.* (quoting *Energy Reserves Grp.,*

*Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411 (1983)).  Roberts concedes that

terminating the Leases constitutes a substantial impairment and does not take issue

with the characterization of his decision on the Leases as a "complete repudiation"

thereof.  "Complete repudiation" of a contract would seem the most severe variety of

impairment possible, but it remains true that "repudiation" may take different forms and

present itself in different degrees.  The repudiations in question were not, in fact,

"complete," or even all that far-reaching or substantial.  In these Leases, "repudiation"

took the form of an only marginally premature cessation of the stream of income that

each Lease represented, except in one instance—the Fisher Suite 450 Agreement, in

which about one-third of the Lease term was cancelled.  About a ten to twelve percent

reduction occurred in the other instances, and with that in mind, the court finds

"*complete* repudiation" an excessively redolent term to describe what actually

happened.

The circumstances of the case suggest differing levels of scrutiny.  The fact that

§ 19(1)(j) was not self-serving to the State of Michigan weighs in favor of simply

deferring to the Michigan Legislature's judgment.  Roberts's premature truncation by

about one-third of one Leases' income stream may be seen as severe, and so indicate

11

that less deference, *i.e.*, more careful scrutiny, is warranted in that instance.  Even so, less deference does not imply no deference.  *Buffalo Teachers Fed'n*, 464 F.3d at 370 (citing *Local Div. 589, Amalgamated Transit Union v. Massachusetts*, 666 F.2d 618, 643 (1st Cir. 1981)).  Balancing these competing interests, the court will attend more cautiously to the Fisher Suite 450 Agreement and analyze all of Roberts's actions with a marginally reduced level of deference.

### v. Reasonableness

Roberts did not violate the Contracts Clause if, by applying a marginally reduced level of deference, the court finds that modifying and then terminating the Leases was "both reasonable and necessary to serve the admittedly important purposes claimed by the State."  *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 29 (1977).  The court begins by considering whether termination comports with a sensible understanding of "reasonable."

One relevant factor in determining reasonableness is "[t]he extent of the impairment."  *Id.* at 27.  In *U.S. Trust Co.*, the trial court held that "total repudiation, presumably for even a worthwhile public purpose, would be unconstitutional" but that the Contracts Clause's protection only extended to such extreme cases.  *Id.* at 26.  The Supreme Court disagreed, holding that "the trial court was not correct when it drew the negative inference that any impairment less oppressive than [complete repudiation] was necessarily constitutional."  *Id.* at  27.  *U.S. Trust Co.* concluded that it could not reject a claim under the Contracts Clause "simply because the [contractual] rights were not totally destroyed."  *Id.*  In so holding, the Court did not say that a complete termination of a contract would, in all ways and at all times, be unconstitutional.  Here, terminating a

12

Lease when it had run about 90% of its course, as opposed to a less severe modification, suggests, but is not sufficient to establish, that the impairment is unreasonable in kind. *Cf. Buffalo Teachers Federation v. Tobe*, 464 F.3d 362, 371-72 (2d Cir. 2006) (finding a wage freeze that impaired labor contracts to be reasonable because the wage freeze was "prospective and temporary"). The only other modifications suggested in the circumstances are only marginally different. They include allowing the Leases to run somewhat longer than 90% of their term and voluntarily paying an early cancellation premium. The court is unconvinced that unreasonableness in kind can be established on this record.

An impairment must be reasonable "in light of the surrounding circumstances." *U.S. Trust Co.*, 431 U.S. at 31. A contractual impairment may be reasonable when it is precipitated by an "unforeseen" change of circumstances. *Id.* An impairment is unreasonable when it is motivated by changed circumstances that are only "of degree and not of kind." *Id.* "[A]n impairment is not a reasonable one if the problem sought to be resolved by an impairment of the contract existed at the time the contractual obligation was incurred." *Univ. of Haw. Prof'l Assembly v. Cayetano*, 183 F.3d 1096, 1107 (9th Cir. 1999) (citation omitted).

In *United States Trust Company of New York v. New Jersey*, New York and New Jersey established a Port Authority to coordinate and operate transportation through the port of New York. 431 U.S. 1, 4 (1977). The Port Authority was a financially independent entity funded by bonds issued to private inventors. *Id.* at 4-5. Bridge and tunnel tolls were pledged as security for the bonds. *Id.* at 7. In 1962, the two states entered into a covenant with each other and the bond holders that restricted the ability

13

of the states and the Port Authority to finance passenger railroad transportation through the Port Authority district with the revenue pledged as security for the bonds. *Id.* at 9. In the 1970s New York and New Jersey, in an effort to increase mass transportation, repealed the 1962 covenant to allow the Port Authority to finance mass transportation. *Id.* at 13-14. The repeal of the covenant was challenged as violating the Contracts Clause. *Id.* at 3.

The Supreme Court held that the repeal of the covenant was not reasonable. *Id.* at 31. The court opined:

> "[T]he need for mass transportation in the New York metropolitan area was not a new development, and the likelihood that publically owed commuter railroads would produce substantial deficits was well known. . . . It was with full knowledge of these concerns that the 1962 covenant was adopted. . . .
>
> During the 12-year period between adoption of the covenant and its repeal, public perception of the importance of mass transit undoubtedly grew because of increased general concern with environmental protection and energy conservation. But these concerns were not unknown in 1962, and the subsequent changes were of degree and not of kind. We cannot say that these changes caused the covenant to have a substantially different impact in 1974 than when it was adopted in 1962.

*Id.* at 31-32.

Similar to *U.S. Trust Company*, where the states were aware of mass transportation concerns when they entered into the covenant, it appears that, in general, deficit concerns were known when the District agreed to the Leases during the fiscal years of 2002, 2003, and 2004. However, the parties provide only a general explanation, unsupported by data, about the District's deficit in the early 2000s. Roberts testified at his August 2012 deposition that the District had been operating in a deficit for "decades" and for "more than ten years." (Dkt. # 40-3 at Pg 5.) But the District has

14

experienced a new and substantial decline in student enrollment, losing 100,000

students in the past ten years.  (Dkt. # 41-1 Ex. 1 at Pg 5).  The District's ballooning

deficit has been driven by reductions in state funding, ever-rising "legacy" pension

costs, and declining tax revenue due to a shrinking tax base and diminishing real estate

values.  (Dkt. # 41-1 Ex. 2 ¶¶ 10-12 at Pg 19.)  State funding, the District's most

significant source of revenue, is tied to student enrollment.  (*Id.* ¶¶ 10-11 at Pg 19.)

In 2005, the District underwent debt restructuring "to address a legacy deficit at

that time." (Dkt. # 41-1 Ex. 2 ¶ 9 at Pg 18.)  Roberts also agrees that the District has

long been aware of its budget difficulties.  In the introduction to his summary judgment

motion, Roberts explains:

> For the past 10 years or more, the Detroit Public Schools (District) has faced
> substantial reductions in student population with the resulting loss of state aid
> tied to that population.  During this same time frame, the District has faced
> monumental structural deficits. . . .  To avert total financial collapse, the
> District has been under some type of financial management since the early
> 2000s.

(Dkt. # 41 at Pg 10.)

But without statistics or data about the District's financial state in the early 2000s,

the court does not have the surrounding context, or sufficient information, to determine

whether the $327 million deficit facing Roberts when he was appointed emergency

manager in May 2011 was a change "of degree and not of kind" to the financial

difficulties that existed when the District entered into the Leases between 2002 and

2004.  Just because the District was in debt in 2002 does not render all future

deficits—no matter their size or significance—a mere change "of degree."  Consider a

rainstorm with 30 mph wind which begins to rotate and increases to 300 mph.  This is

15

not a change "of degree" just because both storms contain rain and wind; a change "of kind" has occurred, and a severe thunderstorm that can be survived has transformed into a devastating tornado.  Similarly, a $30 million deficit that expands to a *$300* million deficit does not constitute a simple change "of degree" just because the District was operating at a loss in both instances.

Additionally, terminating the Leases was reasonable if the $327 million deficit was caused by an "unforseen change of circumstances."  Yet the factors driving the District's deficit in the early 2000s are largely unexplained.  In order to find the Lease terminations unreasonable, the court must find that the District was aware, at the time it entered the Leases, that a similarly sizeable deficit existed and that the circumstances driving that deficit could persist.  The factual record on the extent of the District's deficit in the early 2000s and its causes must be further developed before the court determines whether terminating the Leases was reasonable.

### vi. Necessary

An impairment is not "necessary" when the government could have adopted "a less drastic modification" for achieving its legitimate public purpose.  *U.S. Trust Co.*, 431 U.S. at 30.  The Supreme Court, in *U.S. Trust Company*, taught that "a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well."  *Id.* at 31.  Furthermore, the government cannot "consider impairing the obligations of its own contracts on a par with other policy alternatives."  *Id.* at 30-31.  The Court in *U.S. Trust* was speaking from the perspective of an obviously self-serving state disavowing its own earlier commitments, and the

lesson is less persuasive where the motivation of self interest is either absent, as here, or at least not obvious.

The District's financial situation was too massive to be remedied in one fell swoop. Roberts was in a $327 million budget hole and, knowing he could not eliminate such an amount in one year, prepared a budget to reduce the deficit by more than $200 million. (Dkt. # 40-3 at Pg 4.) He took many other steps to reduce the deficit in addition to terminating the Leases. He closed school buildings, leased schools to the Education Achievement Authority, reduced employee wages and benefits, and laid off employees. Roberts surpassed his first-year goal by reducing the deficit to $84 million—a $243 million reduction. (*Id.*)

Roberts estimated that the District would have saved $2,291,030 if the Leases had been terminated on their first available termination date of November 30, 2011. (Dkt. # 40-18 at Pg 2.) In the event, he relented and allowed the Leases to continue through their eventual termination on January 31, 2012—sixty days after the first noticed termination date. Thus, the actual amount saved from the terminations is necessarily some amount less than the estimated $2.3 million. However, neither party has alleged a precise amount that the District saved by terminating the Leases on January 31, 2012.[1] Taking just one of the affected leases—the Suite 100 Agreement—as an exemplar, termination fourteen months early equaled about an

---

[1] William Aldridge, the Chief Financial Officer for the District, testified that he did not calculate how much money the District actually saved by terminating the Leases. (Dkt. # 40-17 at Pg 9.)

11.5% reduction.  *See supra* chart under Section I.  Termination two months earlier would have resulted in about a 13% reduction.  The court may fairly infer from this that the District realized in the range of $2 million from the Lease terminations.

The amorphous nature of the Michigan Legislature's goal to eliminate the District's deficit complicates the determination of whether Roberts could have achieved this public purpose through less drastic means.  Neither the Michigan Legislature in general terms nor Roberts in particular set a specific goal for decreasing deficits by a precise monetary amount over a certain time frame.

Roberts's mission was to simply attack the deficit and restore the District's financial health, presumably as quickly as possible without jeopardizing the students' quality of education.  The court will not find the Lease terminations unnecessary simply because the District saved only approximately $2 million, a small sum compared to Roberts's self-imposed $200 million goal.  Savings, no matter how small, can be critical when tackling such a large deficit.  Nor will the court find the terminations unnecessary because Roberts would have exceeded his first-year goal by $39 million even without terminating the Leases.  Such a holding would only encourage similarly-situated governmental units to set unrealistically high deficit-reduction goals in order to prove that every cost-savings impairment is necessary under a Contracts Clause challenge.

Little discussion is offered on the cost-savings options that Roberts did not implement.  Roberts concedes at his deposition that he did not analyze whether taking a different action could have saved the District the same amount of money that would have been saved by terminating the Leases.  (Dkt. # 40-16 at Pg 3, 8; Dkt. # 40-17 at

Pg 9.)  Such a calculation was not made, perhaps, because Roberts determined that the Leases must be terminated in order to consolidate the District's employees into a single building.  According to Roberts, the "impetus" for terminating the Leases was not simply the high cost of the monthly rent payments, but rather that the Leases provided the District with a surplus of office space and that the District's employees were too spread out from one another.  (Dkt. # 40-3 at Pg 6-7; Dkt. # 40-16 at Pg 8.)  As Roberts testified, "I had to get all of my people into one building and I had to get rid of the onerous lease payments that I was making and I took the best way that I knew how to get that done."  (Dkt. # 40-3 at Pg 8.)

Plaintiffs argue that at least one method existed that would have saved the District a comparable amount of money.  Roberts originally enacted a 10% across the board wage reduction for all District employees that would have saved approximately $81 million.  (Dkt. # 40-3 at Pg 4.)  After a teacher's union filed a lawsuit challenging the reduction, Roberts reached an agreement with the union and reduced the wage cut to 7.5%, but still saved the District $71 million.  (*Id.*)  The District would have saved an additional $10 million—approximately five times the amount saved from terminating the Leases—had Roberts followed through with the 10% wage cut.

The wage cut, however, also impaired the District's contractual obligations. Impairing one contract is not rendered "unnecessary" to further a legitimate public purpose simply because a different contract could have been impaired in its place. Terminating the Leases was unnecessary if a "less drastic" modification existed—one that did not impair the District's contractual obligations.  The fact that the District could

19

have saved significantly more than $2 million if Roberts imposed a 10% wage cut on teachers demonstrates only that *an* alternative existed.  There is no evidence to demonstrate that one was less drastic than the other, considering all of the District's contractual obligations.

The parties' briefing does not thoroughly discuss whether any options existed at the time the Leases were terminated, that would have both avoided impairing the District's contractual obligations and would have reduced the deficit by approximately the same amount saved from terminating the Leases.  The factual record on this matter must be supplemented before the court can render a decision.

Accordingly, as the court cannot determine on the present record whether the Lease terminations were reasonable and necessary, Plaintiffs and Roberts are denied summary judgment on the Contracts Clause claim.  The court will withhold its decision until an evidentiary hearing is held on the undeveloped issues outlined under this opinion's "Reasonableness" and "Necessary" sections.  The court will issue its ruling after the evidentiary hearing.

**B. Takings Clause**

The Takings Clause of the Fifth Amendment states that "private property [shall not] be taken for public use, without just compensation."  U.S. Const. amend. V.  The court must first determine whether Plaintiffs have a protectable property interest in the Leases.  "Valid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States."  *Lynch v. United States*, 292 U.S. 571, 579 (1934).  "When the Government and private parties contract, . . . the private party

20

usually acquires an intangible property interest within the meaning of the Takings Clause in the contract." *Adams v. United States*, 391 F.3d 1212, 1221 (2004). However, "the fact that legislation disregards or destroys existing contractual rights does not always transform the regulation into an illegal taking." *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 224 (1986). "Property interests are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits that support claims of entitlement to those benefits." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). To establish a protected property interest, a claimant "must have more than an abstract need or desire for it." *Id.* Instead, the claimant must have a "legitimate claim of entitlement" to the claimed interest. *Id.*

Each Lease stated that Plaintiffs would receive a specified monthly rent payment from the District until the expiration of the Lease. Of the six Leases, only the Suite 136 Agreement provided the District with the option to terminate the Lease early. However, the District had only until May 14, 2002, to terminate the Suite 136 Agreement early, after which early termination was no longer an option. Thus, terminating the Leases in January 2012, prior to their scheduled expirations, was made possible only by Roberts modifying the Leases pursuant to § 19(1)(j). "The express rights under [a] contract are just as concrete as the inherent rights arising from ownership of real property, personal property, or an actual sum of money." *Adams*, 391 F.3d at 1221-22. When the Leases were executed, Plaintiffs had a "legitimate claim of entitlement" to receive the agreed

21

upon rent payments until the Leases expired.  Plaintiffs had a protectable property interest in the rental income guaranteed in the Leases.

The parties agree that the termination of the Leases could only constitute a regulatory taking, not a physical one.  The court makes an *ad hoc* inquiry to determine if an unconstitutional regulatory taking has occurred and examines three factors: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action."  *Connolly*, 475 U.S. at 224-25 (citing *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 124 (1978)).

When the six Leases were terminated, the following amounts of time remained on their respective terms: 7 months; 1 year and 1 month; 1 year and 2 months; 1 year and 2 months; 1 year and 3 months; and 3 years and 4 months.  Thus, Plaintiffs lost approximately 10% of the expected rental income on five of the Leases and approximately 30% on the sixth Lease.  Roberts argues that because Plaintiffs collected the great bulk of the rents due under each Lease, the economic impact of the terminations was minimal.  Plaintiffs, however, argue that they have suffered substantial economic losses "in excess of $2 million" and that they are "entitled to introduce evidence in that regard."  (Dkt. # 43 at Pg 23.)  While Plaintiffs are so entitled, the time to proffer such evidence is now—when Roberts moved for summary judgment.  Plaintiffs, as the non-moving parties, "must put forth enough evidence to show that there exists a genuine issue to be decided at trial."  *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000) (citation omitted).  Yet Plaintiffs have not offered any evidence to

22

support the assertion that they have lost over $2 million.  The terminations cost Plaintiffs

only one-tenth of the total expected rental income on five of the six Leases, and

Plaintiffs have not submitted evidence establishing substantial economic loss.

Accordingly, Plaintiffs have not met their burden of showing that there is a genuine

issue of fact that the economic impact of the terminations was anything other than

minimal.

The second prong of the regulatory takings analysis considers the extent to

which a law interfered with distinct investment-backed expectations.  Plaintiffs own all or

a "substantial portion" of the three buildings that house the commercial space at issue in

the Leases.  As these buildings are subject to mortgages, Plaintiffs argue that

terminating the Leases severely interfered with their investment-backed expectations

because they have been unable to re-lease the commercial space and have been

placed in "financial peril."  (Dkt. # 43 at Pg 23.)  While Plaintiffs, as building owners, may

be having difficulty finding new tenants, § 19(1)(j) in no way interferes with Plaintiffs'

*ability* to lease the commercial space.  If Plaintiffs purchased the buildings with the

expectation they could lease it as commercial space, and § 19(1)(j) barred Plaintiffs

from doing so, then § 19(1)(j) may have interfered with Plaintiffs' investment-backed

expectations.  Yet Roberts's decision to terminate the Leases pursuant to § 19(1)(j)

does not prevent Plaintiffs from leasing the commercial space to new tenants; Plaintiffs

remain free to lease the commercial space just as they were prior to Roberts

terminating the Leases.

Finally, terminating the Leases is uncharacteristic of a regulatory taking. The Leases were impaired in an effort to restore the District's financial health. Thus, the interference of the Leases "arises from a public program that adjusts the benefits and burdens of economic life to promote the common good," which does not suggest that a taking has occurred. *Connolly*, 475 U.S. at 225. While Plaintiffs incurred a marginal economic loss so that the District may reduce its deficit, "such burden shifting does not, without more, amount to a regulatory taking." *See Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 376 (2d Cir. 2006). Furthermore, the government did not affirmatively take anything from Plaintiffs. Instead, Roberts extinguished Plaintiffs' contractual right to receive monthly rent payments, which is not indicative of a regulatory taking. *See id.* at 375 (finding that a regulatory taking did not occur when the government annulled the plaintiffs' contractual right to a wage increase).

After considering the factors, the court finds that a regulatory taking did not occur when Roberts terminated the Leases pursuant to § 19(1)(j). The court will grant Roberts summary judgment on the Takings Clause claim.


## IV.  CONCLUSION

Accordingly, IT IS ORDERED that Plaintiffs' motion for summary judgment [Dkt. # 40] is DENIED.

IT IS FURTHER ORDERED that Defendant's motion for summary judgment [Dkt. # 41] is GRANTED IN PART and DENIED IN PART.  It is GRANTED with respect to the Takings Clause claim and is DENIED with respect to the Contracts Clause claim.

 s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  May 31, 2013

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, May 31, 2013, by electronic and/or ordinary mail.

 s/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522

S:\Cleland\JUDGE'S DESK\C1 ORDERS\12-10122.NCO.Deny.Summ.Judg.wpd